IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BRANDON RYAN THOMPSON, | * | |
| Plaintiff | * | |
| v | * | Civil Action No. PWG-16-2674 |
| State of Maryland, *et al.*, | * | |
| Defendants | * | |
| | *** | |

**MEMORANDUM OPINION**

Plaintiff Brandon Ryan Thompson ("Plaintiff" or "Mr. Thompson") is an inmate currently incarcerated at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. Am. Compl. 1, ECF No. 16. He seeks redress pursuant to 42 U.S.C. § 1983 for alleged Eighth Amendment violations on May 30, 2015 by Correctional Officers Chase Dykes and Luis Santos (in both their official and personal capacities)[1] while he was incarcerated at Eastern Correctional Institution ("ECI") in Westover, Maryland. Am. Compl. 4, 10. Defendants have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 27. Mr. Thompson filed a belated Opposition and Cross-Motion for Summary Judgment on February 20, 2018, ECF No. 37, more than six months after Defendants filed their Motion. As the Fourth Circuit's preference is to decide cases on the merits, *see United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993), I have considered Mr. Thompson's Opposition despite it being untimely. A hearing is

---

[1] Plaintiff named the State of Maryland as a defendant in his original Complaint, ECF No. 1, but only names Officers Dykes and Santos in his Amended Complaint. Insofar as Plaintiff brings his claims against the Officers Dykes and Santos in their official, as well as individual, capacities, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64–65, 70–71, n.10 (1989). A state is not "a 'person' within the meaning of 42 U.S.C. § 1983," and accordingly is not a proper defendant. *See Kelly v. Bishop*, No. RDB-16-3668, 2017 WL 2506169, at *4 (D. Md. June 9, 2017) (citing *Will*, 491 U.S. at 64–65 & 70–71). Therefore, Mr. Thompson's claims against Officers Dykes and Santos in their official capacities are dismissed. *Id.*

unnecessary. *See* Loc. R. 105.6. There is no genuine dispute of material fact, and Defendants are entitled to judgment as a matter of law. Defendants' motion, construed as a motion for summary judgment, will be granted and Mr. Thompson's motion for summary judgment will be denied.[2]

## Standard of Review and Evidentiary Record

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see also Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* A "genuine" dispute of material fact is one where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create "fair doubt." *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin v.*

---

[2] Because the Defendants filed a motion titled "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment," along with documents in support, to which Plaintiff responded with his own summary judgment motion, Plaintiff was on notice that the Court could treat the motion as one for summary judgment and rule on that basis. *See Laughlin v. Metro. Wash. Airports Auth.,* 149 F.3d 253, 260–61 (4th Cir. 1998); *Walker v. Univ. of Md. Med. Sys. Corp.,* No. CCB–12–3151, 2013 WL 2370442, at *3 (D. Md. May 30, 2013); *Ridgell v. Astrue,* No. DKC–10–3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012).

*Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). The substantive law governing the case determines what is material. *See Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A fact that is not of consequence to the case, or is not relevant in light of the governing law, is not material. *Id.*; *see also* Fed. R. Evid. 401 (defining relevance). "In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party." *Downing v. Balt. City Bd. of Sch. Comm'rs*, No. RDB 12-1047, 2015 WL 1186430, at *1 (D. Md. Mar. 13, 2015) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

There is no genuine dispute of material fact if the nonmoving party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Therefore, on those issues for which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an affidavit that "set[s] out facts that would be admissible in evidence" or other similar facts that could be "presented in a form that would be admissible in evidence" showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c)(2), (4); *see also Ridgell,* 2012 WL 707008, at *7; *Laughlin,* 149 F.2d at 260–61.

Defendants have attached to their motion an extensive amount of evidence to include verified administrative and investigative records, Admin. R., ECF No. 27-2; IID Report, ECF No. 27-3, and eight sworn declarations from the officers involved in the alleged incidents, Mitchell Decl., ECF No. 27-4; Richardson Decl., ECF No. 27-5; Dykes Decl., ECF No. 27-6; Santos Decl., ECF No. 27-7; Arvey Decl., ECF No. 27-8; Butler Decl., ECF No. 27-9; Kiser Decl., ECF No. 27-10; Elliott Decl., ECF No. 27-11. In contrast, in his opposition and cross-motion for summary judgment, Mr. Thompson relies on his unverified complaint, excerpts from Defendants' exhibits,

ECF Nos. 37-2, 37-3, 37-4, 37-5, 37-6, and a declaration from Mr. Steven Tarpley regarding possible video evidence of the incidents,[3] ECF No. 37-7. Because Plaintiff's Complaint is not verified, its factual assertions may not be considered in support of his summary judgment motion, or in opposition to Defendants' motion. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); Fed. R. Civ. P. 56(c)(1)(A); *see also Abdelnaby v. Durham D & M, LLC*, No. GLR-14-3905, 2017 WL 3725500, at *4 (D. Md. Aug. 29, 2017) (awarding summary judgment for the defendants, because the plaintiff could not "create a genuine dispute of material fact 'through mere speculation,'" and "[t]hus, the Court [wa]s left with a record that [wa]s bereft of evidence supporting any of Abdelnaby's arguments") (quoting *Beale v. Hardy*, 769, F.2d 213, 214 (4th Cir. 1985)).

## Background

On May 30, 2015, when Mr. Thompson refused to comply with an order for a pat down search, Officer Mitchell ordered him to leave the recreation yard and to return to his housing unit. Mitchell Decl. ¶¶ 6; *see* Am. Compl. 1. He did. Mitchell Decl. ¶¶ 5–6; *see* Am. Compl. 1. Upon arriving at his housing unit, Mr. Thompson attempted to go to the "day room," Am. Compl. 1, and refused Officer Richardson's order for him to return to his cell, *id.*; Richardson Decl. ¶¶ 5–6. Mr. Thompson then told Officer Richardson that he wanted to speak to the officer in charge of the housing unit. Richardson Decl. ¶ 7; Am. Compl. 4. Officers Dykes and Santos, who were

---

[3] Steven Tarpley, who was an inmate at ECI in 2002 and 2009, stated that he has knowledge of where the video cameras are placed at ECI and expresses the opinion that there should be video surveillance of these altercations. *See* Tarpley Decl. 3. Yet, on May 30, 2015, the date of the alleged assaults, Captain Joseph Berczky wrote a memorandum to Security Chief Mayock about the incidents, stating: "The . . . Use of Force was not videotaped due to the spontaneous nature of the incident and the lack of a stationary camera in the area." Admin R. 27. Thus, there is no evidentiary basis in the materials before me to conclude that there was spoliation of evidence or that any adverse inference may be drawn against the Defendants.

present, took Mr. Thompson in custody. Richardson Decl. ¶ 8; Am. Compl. 5 (stating that Officer "Dykes pulled him towards the clerks [sic] office").

Mr. Thompson then alleges that as Officer Dykes "was pulling [him, he] started to lose [his] footing so the Plaintiff tried to brace himself to gather his footing." Am. Compl. 5. According to Mr. Thompson, Officer Dykes "thought [Mr. Thompson] was being noncompliant and he slammed [Mr. Thompson] against the door and then told [him] to sit down . . . ." Admin. R. 73 (emphasis added). Plaintiff alleges that Officer Dykes "slammed the plaintiff[']s face into the clerk[']s office door and used his forearm the [sic] pin plaintiff[']s head into the door." Am. Compl. 5. Officer Dykes denies using any force against Mr. Thompson. Dykes Decl. ¶ 8.

After Mr. Thompson refused to return to his cell in Housing Unit 3, Officer Santos began escorting him to Housing Unit 4 (the disciplinary segregation unit). Am. Compl. 5–6; Santos Decl. ¶ 4. Officer Santos stated that Mr. Thompson then "began yelling 'I'm not going anywhere' and 'You can't do this.'" Santos Decl. ¶ 5. As Officer Santos and Mr. Thompson headed to the doorway, Officer Arvey[4] held the door open. *Id.*; Am. Compl. 6. Officer Santos stated that Mr. Thompson lunged at Officer Arvey while calling her a "bitch," and in order to regain control, he pulled Mr. Thompson away and placed him against the wall. Santos Decl. ¶¶ 6–7. Mr. Thompson admits that he said "fuck you bitch" to Officer Arvey and alleges that then,

> [w]ithout warning, defendant Santos slammed Plaintiff face into the wall and said "What did you call her." And then proceeded to slam him to the ground causing plaintiff to lose consciousness immediately. When Plaintiff was finally able to get his full berrings [sic] back and understand what was going on, he was being escorted to Summerset Hospital.

Am. Compl. 6. According to Officer Santos, Mr. Thompson continued to make threats while on the ground and told Officer Santos "he would beat [Officer Santos's] ass and told [Officer Santos]

---

[4] Officer Arvey is referred to in parts of the records by Plaintiff and Defendants as Officer Avery. Because she identifies herself as Officer Arvey in her declaration, I will refer to her by that name throughout, unless quoting the record directly.

5

to take his cuffs off and see if [Officer Santos] was tuff [sic]." Notice of Inmate Rule Violation, Admin. R. 32. At this point, a "signal 13 call" was broadcast over the ECI radio frequency. *See* Mitchell Decl. ¶ 9; Dykes Decl. ¶ 6; Santos Decl. ¶ 8; Butler Decl. ¶ 4. A signal 13 call means that "staff is under imminent threat and/or assault." Kiser Decl. ¶ 4; *see also* Santos Decl. ¶ 8; Butler Decl. ¶ 4. Captain Kiser and Officers Mitchell, Dykes, and Butler responded to the call. *See* Kiser Decl. ¶¶ 4–5; Santos Decl. ¶ 8; Butler Decl. ¶ 4.

Captain Eric Kiser stated that he "observed COII Santos on the ground with Mr. Thompson," and that he ordered Officer Santos to report to medical after instructing Officers Butler and Mitchell to take custody of Mr. Thompson. Kiser Decl. ¶ 5. He also stated that he "gave several direct orders to Mr. Thompson to stop resisting and comply. Mr. Thompson continuously refused to comply. [He] instructed COII Chase Dykes to retrieve leg irons from Housing Unit 3 and place them on Mr. Thompson." *Id.* ¶ 6.

Nurse Susan Johnson then arrived with a wheelchair and escorted Mr. Thompson to Housing Unit 4 where she conducted a medical evaluation. *Id.* ¶ 7. Nurse Johnson's medical notes reflect that Mr. Thompson had an abrasion to his cheek, was bleeding minimally, and had a small contusion on his forehead. Admin. R. 3. The administrative record indicates that when Nurse Johnson arrived, Mr. Thompson's "breathing was normal and not labored but he was not responding to voice commands." *Id.* at 2; *see also id.* at 16 ("Thompson would not respond to voice nor obey commands from medical staff."); IID Report 7 (Nurse Johnsons "noted that his breathing was easy and unlabored. He refused to respond to her voice or obey commands."). He was then transported in the wheelchair to West Dispensary where the medical department determined he should be sent to Peninsula Regional Medical Center. Kiser Decl. ¶ 7. The reports

state that he was transported to the hospital because of his "altered mental state." *See, e.g.*, Admin. R. 2, 16.

Although Mr. Thompson claims that he lost consciousness during the incident with Officer Santos, none of the other witness declarations says that he did, neither do the medical records that relate to the injuries that he claims from the incident. To the contrary, the one record that does mention his state of consciousness is from the hospital where Mr. Thompson received treatment, and it states "Pt [patient] denies LOC [loss of consciousness] but states that he cannot remember anything else." IID Report 90. Of course, the absence of any mention of Mr. Thompson's loss of consciousness in the medical records that relate to the incident has evidentiary significance. Medical records are classic examples of business records, Fed. R. Evid. 803(6), and in circumstances where it would be expected that a medically significant occurrence (such as loss of consciousness) would be included in a medical record pertaining to the event that led to the treatment, then its absence is evidence that there was no such occurrence (loss of consciousness). Fed. R. Evid. 803(7). And, Mr. Thompson has not shown that the medical records are untrustworthy, and therefore, should not be given evidentiary weight. To the contrary, his own statement to medical staff at the hospital where he was treated for the incident with Officer Santos is the source of the confirmation that he did not lose consciousness, as he now claims.

Stemming from the day's events, Mr. Thompson was charged with eight inmate rule violations, three of which were resolved informally. Admin R. 32, 76, 79, 80, 83. In connection with his interaction with Officer Santos, Mr. Thompson was found guilty of two charges for disobeying an order and demonstrating disrespect or use of vulgar language. *Id.* at 67. The Hearing Officer found Mr. Thompson not guilty of three charges (interfering with or resisting the

7

performance of staff duties; using intimidating, coercive, or threatening language; and engaging in a disruptive act) because the "Event File contain[ed] no Use of Force Reports, Serious Incident Reports, photo of officer inquiries, or medical note regarding Thompson's condition," and "[t]he lack of evidence provided, combined with the unavailability of the witness [Officer Santos] call[ed] some of the details in the Notice into question." *Id.* at 73. While not available for the hearing examiner to review during Mr. Thompson's infraction hearing, these records are part of the record before me, as well as Officer Santos' declaration.

Additionally, an internal affairs investigation was conducted to determine if Officer Santos committed second degree assault. IID Report 5. The conclusion was that "it was Inmate Thompson who caused the escalation of force used to gain control of him," and no criminal charges were filed against Santos. *Id.* at 8.

## **Analysis**

The Supreme Court has held that not every use of force is actionable under the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* (quoting *Whitley,* 475 U.S., at 327). Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 6–7. This court must look at "the need for application of force"; "the relationship between that need and the amount of force that was used"; "the extent of the injury inflicted"; "the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials"; and "any efforts made to temper the severity of the response." *Whitley v. Albers*, 475 U.S. 312, 321

(1986). The extent of the injury incurred is one factor indicating whether the force used was necessary in a particular situation, but if force was applied maliciously and sadistically, liability is not avoided simply because the prisoner had the "good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 36–38 (2010).

Overwhelmingly, the facts in this case are not subject to dispute or if they are, they are immaterial to Mr. Thompson's claims. Both Mr. Thompson and Defendants agree that the events in question began when Mr. Thompson refused to obey an order, and that he challenged the officers' orders during both incidents. As for Officer Dykes's alleged use of excessive force specifically, Mr. Thompson has not submitted any admissible evidence that Officer Dykes slammed his head into a door, and Officer Dykes has submitted unrebutted sworn testimony that he did not use force on Mr. Thompson. Dykes Decl. ¶ 8; *see also id.* ¶¶ 4–5 (stating that he and Officer Santos "took custody of Mr. Thompson after Officer Richardson handcuffed and escorted inmate Thompson to the foyer of Housing Unit 3" before Officer Santos took custody of Plaintiff). And, it is undisputed that while Officer Dykes was escorting him, Mr. Thompson tripped, and Officer Dykes perceived (reasonably, given the circumstances) Mr. Thompson's movement as noncompliant. Admin. R. 73.

With regard to Officer Santos's alleged use of excessive force, the parties agree that Plaintiff's altercation with Officer Santos occurred immediately after Plaintiff said "fuck you bitch" to Officer Arvey. Am. Compl. 6; Santos Decl. ¶¶ 5–7; Arvey Decl. ¶¶ 5–6; *see also* Admin. R. 72 (hearing testimony where Plaintiff admits to vulgar language used against Officer Arvey). And, there is unrebutted evidence that Plaintiff was yelling defiantly when Officer Santos began escorting him; that Plaintiff "lunged" at Officer Arvey; that, in response to Plaintiff's actions toward Officer Arvey, Officer Santos "placed [Mr. Thompson] up against the

9

wall to regain control of him"; and finally, that "Mr. Thompson let himself drop to the ground, which caused [Santos] to fall down with him." Santos Decl. ¶¶ 5–7; Arvey Decl. ¶¶ 5–6; *see also* Admin R. 5 ("During the escort Thompson let his body go limp pulling COII Santos to the ground with him."); IID Report 6 ("Inmate Thompson dropped his body to the ground and wouldn't walk. When he dropped to the ground, he pulled Officer Santos down with him.").

A correctional officer is justified in using a reasonable amount of force to control a noncompliant prisoner. *See Wilkins*, 559 U.S. at 38 (noting that the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm" (quoting *Hudson*, 503 U.S. at 7)). The undisputed evidence shows that both officers were trying to control Mr. Thompson when he was not complying, and that, when Mr. Thompson tripped while Officer Dykes was escorting him, it was reasonable for Officer Dykes to believe that it was an act of noncompliance. This undisputed actual and reasonably perceived noncompliance demonstrates that the use of force by Officers Dykes and Santos was not malicious in nature. On the record before me, it is indisputable that the force that Officer Dykes and Santos may have used while escorting the Plaintiff around Housing Unit No. 3 and to Housing Unit 4 was a reasonable response to Plaintiff's actual and perceived noncompliance. Indeed, more aggressive acts of control than what appears to have occurred here—a hand hold while escorting an inmate and placing him against the wall—are permitted when an inmate does not follow orders. *See, e.g.*, *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (holding that the use of pepper spray is not a per se violation of the Eighth Amendment when used "to control recalcitrant inmates") (quoting *Landman v. Peyton*, 370 F.2d 135, 138 & n.2 (4th Cir. 1966)). Neither Defendants' actions amount to an Eighth Amendment violation. *See Wilkins*, 559 U.S. at 38; *Hudson*, 503 U.S. at 7; *Williams*, 77 F.3d at 763.

Additionally, while it is undisputed that he was sent to the hospital after the altercation, Mr. Thompson does not allege that he did not receive adequate medical attention. Significantly, while the absence of any serious injury, viewed in isolation, does not mean that excessive force was not used, the absence of injury nonetheless is relevant, as it is evidence of the amount of force that was used. The medical records and other evidence of record show that the Plaintiff sustained only minor injuries as a result of *both* incidents, Admin. R. 3 (Mr. Thompson "had small abrasions on the right side of his cheek minimal bleeding, and a small contusion on the left side of his forehead"); IID Report 7 (Nurse Johnson "noted that his breathing was easy and unlabored. He refused to respond to her voice or obey commands"), which corroborates the fact that the use of force by Officers Dykes and Santos to maintain control of Mr. Thompson was not excessive. *See Wilkins*, 559 U.S. at 38 ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim.") (quoting *Hudson*, 503 U.S. at 9)). Therefore, Plaintiff has not demonstrated that a reasonable jury could find that the actions of either Officer Dykes or Officer Santos were malicious or that the quantum of force used to control him was excessive. *See id.; Thompson v. Commonwealth of Va.*, 878 F.3d 89, 98 (4th Cir. 2017).

As I interpret Mr. Thompson's memorandum in support of his motion and in opposition to Defendants', he argues that the evidence at his rule violation hearing was lacking to the point that he could not be convicted of the rule violations he was charged with and that the injuries he allegedly suffered (an abrasion, a hematoma, and being unconscious) demonstrate that excessive force was used against him. Pl.'s Mem. 7–8, 13–14. However, a lack of evidence introduced at a hearing to determine if Mr. Thompson violated ECI's rules does not demonstrate that Defendants used excessive force. It only demonstrates that there was insufficient evidence introduced during

that hearing to find him guilty of the alleged rule violations. The hearing officer only acknowledged that the record before him did not sustain the alleged charges. *See* Admin. R. 73. The hearing officer did not have the testimony of Officer Santos, the Use of Force Reports, Serious Incident Reports, or medical notes regarding Mr. Thompson's condition. *Id.* That is not the case here. There is ample information in the record before me (including the information missing at the hearing) to make a determination as to what occurred between Mr. Thompson and Officers Dykes and Santos.

Plaintiff also argues that Officers Dykes and Santos violated the prison's Use of Force policy, which prohibits correctional officers from applying force immediately. *See* Pl.'s Mem. 5–7. Although not explicitly stated, I understand this to mean that Plaintiff believes that the alleged violations of the use of force policy constitute a violation of his constitutional rights. But, even if there had been a failure to comply with the letter of the policy governing use of force, failure to precisely follow procedural guidelines alone does not give rise to a liberty interest. *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987) ("The adoption of mere procedural guidelines, however, does not give rise to a liberty interest protected under the fourteenth amendment. Rather, the state must use 'language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed and that [the challenged action of prison authorities] will not occur absent specified substantive predicates . . . .'" (quoting *Hewitt v. Helms,* 459 U.S. 460 471–72 (1983))); *see also Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (holding that failure to follow a "prison's own policies, procedures or regulations does not constitute a violation of due process, if constitutional minima are nevertheless met"). Thus, the failure to follow regulations does not, in and of itself, result in a constitutional violation for excessive force.

**Conclusion**

Plaintiff's claims against Officers Santos and Dykes in their official capacity are dismissed with prejudice. *See Will*, 491 U.S. at 64–65, 70–71, n.10; *Foman v. Davis*, 371 U.S. 178, 182, (1962) (noting that reasons to deny leave to amend include, *inter alia*, "futility of amendment"). Additionally, Defendants are entitled to judgment as a matter of law on the claims against them in their individual capacity. Therefore, Defendants' motion for summary judgment will be granted and Plaintiff's cross-motion denied. A separate Order follows.

March 16, 2018 /S/
Date Paul W. Grimm
United States District Judge